STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-31


DRAUGHN KOONCE

VERSUS

ST. PAUL FIRE & MARINE INS. CO., ET AL.



**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2006-4460
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

**********

**JOHN D. SAUNDERS**
**JUDGE**

**********


Court composed of John D. Saunders, Elizabeth A. Pickett, and Phyllis M. Keaty, Judges.


**AFFIRMED.**

**Robert C. McCorquodale**
**In House Counsel**
**P. O. Box 2185**
**Lake Charles, LA 70602**
**(337) 491-3622**
**COUNSEL FOR DEFENDANT/APPELLEE:**
 **Calcasieu Parish Sheriff's Office**
 **Calcasieu Parish Unnamed Sheriff Deputy**

**John Ezell Jackson**
**Attorney at Law**
**P. O. Box 1239**
**Lake Charles, LA 70602**
**(337) 433-8866**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
 **Draughn Koonce**

**Vernon Ed McGuire, III**
**Plauche', Smith & Nieset**
**P. O. Drawer 1705**
**Lake Charles, LA 70602**
**(337) 436-0522**
**COUNSEL FOR DEFENDANT/APPELLEE:**
 **St. Paul Fire & Marine Ins. Co.**

**SAUNDERS, Judge.**

Plaintiff, Draughn Koonce (hereafter "Appellant"), appeals from the trial court's grant of summary judgment in favor of Defendants, Tony Mancuso, individually and in his official capacity as the Sheriff of Calcasieu Parish, and his insurer, St. Paul Fire and Marine Insurance Company (hereafter collectively "Appellees") and denial of Appellant's motion to strike Appellees' supplemental and amended answer and affirmative defenses. For the reasons that follow, we affirm the trial court's judgment in all respects.

**FACTS AND PROCEDURAL HISTORY:**

Appellant was an inmate at the Calcasieu Correctional Center. On September 22, 2005, as Hurricane Rita approached land, a school bus driven by Deputy Ryan Lavergne (hereafter "Lavergne") was transporting prisoners, including Appellant, for evacuation when it crashed into the rear end of another school bus that was also transporting prisoners for evacuation.

On September 22, 2006, Appellant filed a petition for damages against Appellees, alleging he sustained personal injuries in the crash. Appellees answered on October 24, 2006. Thereafter, no action was taken on the case by either party for a substantial length of time. On January 22, 2014, Appellant filed a first supplemental and amending petition for damages. Appellees filed an answer on February 22, 2014, raising the affirmative defenses of immunity under La.R.S. 29:735, and La.R.S. 9:2800.17.

On March 26, 2014, Appellant filed a motion to strike Appellees' answer and affirmative defenses, asserting that Appellees' answer was not timely, having been filed into the record thirty-one days after Appellant filed his supplemental and amending petition, and that there were "no allegation of new facts. . . that justified the assertion of these new affirmative defenses at such a late date." Appellees then

filed a motion for summary judgment on June 6, 2014, asserting immunity pursuant to the above-cited statutes. A hearing on the motions of both parties was held on June 24, 2014, after which the trial court denied Appellant's motion to strike, granted summary judgment in favor of Appellees, and dismissed the claims of Appellant. It is from this judgment that this appeal arises.

**ASSIGNMENT OF ERROR NUMBER ONE**

In his first assignment of error, Appellant contends the trial court legally erred in "apply[ing] a liberal construction" of La.R.S. 29:735 "to the facts at hand" and in concluding that "willful misconduct" required that there be "some type of specific intent . . . to cause some type of injury or harm. Thus, he contends that the trial court erred in granting Appellees' motion for summary judgment.

**Standard of Review**

An appellate court reviews de novo the ruling of the trial court on a motion for summary judgment. *Covington v. McNeese State Univ.*, 08-505 (La.App. 3 Cir. 11/5/08), 996 So.2d 667, *writ denied*, 09-69 (La. 3/6/09), 3 So.3d 491. "[T]he same criteria that govern a trial court's determination of a motion for summary judgment" are applied. *Breaux v. Cozy Cottages, LLC*, 14-486, p. 4 (La.App. 3 Cir. 11/12/14), 151 So.3d 183, 187. "The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action. . . . The procedure is favored and shall be construed to accomplish these ends." La.Code Civ.P. art. 966(A)(2). A motion for summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, admitted for the purposes of the motion for summary judgment, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.

La.Code Civ.P. art. 966(B)(2).

2

Whether a given set of conduct rises to the level of "willful misconduct" or "criminal, willful, outrageous, reckless, or flagrant misconduct" is a standard created by law to determine whether liability will result from that conduct; as such, the question of whether a given set of conduct rises to the level of "willful misconduct" or "criminal, willful, outrageous, reckless, or flagrant misconduct" is purely a question of law, and is within the province of the trial court to determine at the summary judgment stage.

*Haab v. E. Bank Consol. Special Serv. Fire Prot. Dist. of Jefferson Parish*, 13-954 p. 9 (La.App. 5 Cir. 5/28/14), 139 So.3d 1174, 1181, *writ denied sub nom. Haab v. E. Bank Consol. Special Serv. Prot. Dist. of Jefferson Parish*, 14-1581 (La. 10/24/14), 151 So.3d 609.

## Discussion

The Louisiana Homeland Security and Emergency Assistance and Disaster Act (hereafter "the Act"), La.R.S. 29:721 *et. seq.*, defines emergency preparedness as "the mitigation of, preparation for, response to, and the recovery from emergencies or disasters." La.R.S. 29:723(4). A disaster is "a natural or man-made event which causes loss of life, injury, and property damage, including but not limited to natural disasters such as a hurricane." La.R.S. 29:723(2). An emergency is "the actual or threatened condition that has been or may be created by a disaster." La.R.S. 29:723(3)(a). Louisiana Revised Statutes 29:735, provides, in pertinent part:

A. (1) Neither the state nor any political subdivision thereof, nor other agencies, nor, except in case of willful misconduct, the agents' employees or representatives of any of them engaged in any homeland security and emergency preparedness activities, while complying with or attempting to comply with this Chapter or any rule or regulation promulgated pursuant to the provisions of this Chapter shall be liable for the death of or any injury to persons or damage to property as a result of such activity.

Thus, the State, its agencies, and political subdivisions are afforded complete immunity for injury or death resulting from emergency preparedness activities. *Castille v. Lafayette City-Parish Consol. Gov't*, 04-1569 (La.App. 3 Cir. 3/2/05),

896 So.2d 1261, *writ denied*, 05-0860 (La. 5/13/05), 902 So.2d 1029. Pursuant to the same statute, agents, representatives, or employees of the State, its political subdivisions, or agencies are also completely immune except where they have engaged in willful misconduct in the course of preparing for a disaster or emergency. *Id.*

There is no dispute that, at the time of Appellant's accident, the State of Louisiana was in a state of emergency and that the evacuation activities constituted emergency preparedness activities pursuant to La.R.S. 29:723. At the time of the accident at issue, the State of Louisiana was under Gubernatorial Proclamation No. 53 KBB 2005, issued by Governor Kathleen Blanco on September 20, 2005, declaring a state of emergency for the State of Louisiana due to Hurricane Rita's approach to Louisiana. The accident at issue occurred in the course of an evacuation pursuant to this order. Thus, the question we must address is whether the actions of the agents, representatives, or employees of the State, its subdivisions, or agencies in the course of the evacuation constitute willful misconduct pursuant to La.R.S.29:735.

In *M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 07-2371, pp. 13-14 (La. 7/1/08), 998 So.2d 16, 26-27, *amended on reh'g* (9/19/08)(citations omitted), the supreme court explained:

> The function of statutory interpretation and the construction given to legislative acts rests with the judicial branch of the government. The rules of statutory construction are designed to ascertain and enforce the intent of the Legislature. Legislation is the solemn expression of legislative will and, thus, the interpretation of legislation is primarily the search for the legislative intent. We have often noted the paramount consideration in statutory interpretation is ascertainment of the legislative intent and the reason or reasons which prompted the Legislature to enact the law.
>
> The starting point in the interpretation of any statute is the language of the statute itself. "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall

4

be applied as written and no further interpretation may be made in search of the intent of the legislature." However, "when the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." Moreover, "when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole."

We first turn to the text of the statute; notably absent are definitions of "willful," "misconduct," or "willful misconduct." Thus, we turn to Black's Law Dictionary (10th ed. 2014), which defines "misconduct" as "a dereliction of duty; unlawful, dishonest, or improper behavior, esp. by someone in a position of authority or trust." "Willful" is defined as "[v]oluntary and intentional, but not necessarily malicious." *Id.* It is further explained that "[a] voluntary act becomes willful, in law, <u>only when it involves conscious wrong or evil purpose on the part of the actor, or at least inexcusable carelessness</u>, whether the act is right or wrong. The term *willful* is stronger than *voluntary* or *intentional*; it is traditionally the equivalent of *malicious*, *evil*, or *corrupt*." *Id.* (underlining added for emphasis) Thus, it is our opinion that, to constitute "willful misconduct," there must be some voluntary, intentional breach of duty, which may be unlawful, dishonest, or improper, or perhaps all three, that is committed with bad intent or, at best, with wanton disregard for the consequences.

We conclude that this interpretation best reflects the intent of the Legislature. The Legislature stated its purpose in promulgating the Act:

> A. Because of the existing possibility of the occurrence of emergencies and disasters of unprecedented size and destructiveness resulting from enemy attack, sabotage, or other hostile action, or from fire, flood, earthquake, or other or manmade causes, and in order to ensure that preparations of this state will be adequate to deal with such emergencies or disasters, and <u>generally to preserve the lives</u> and property of the people of the state of Louisiana, it is hereby found and declared to be necessary:
>
> . . .

5

(4) To reduce vulnerability of people and communities of this state to damage, injury, and loss of life and property resulting from natural or man-made catastrophes, riots, acts of terrorism, or hostile military or paramilitary action.

(5) To prepare for prompt and efficient evacuation, rescue, care, and treatment of persons victimized or threatened by disasters or emergency.

La.R.S. 29:722 (emphasis added).

Although not binding, we find Louisiana Attorney General Opinion No. 08-0093 to provide a useful summary of the Legislative intent in promulgating the Act, of which La.R.S. 29:735 is a part. In that opinion, the Attorney General explored the public policies at issue in providing for various forms of governmental immunity, noting:

> [T]he [Supreme] Court recognized society's interest in an efficient and effective government, which would be hampered by allowing lawsuits to proceed unhindered against government officials exercising discretion within the sphere of their official duties.
>
> The Court observed that the costs to society of litigation brought against government officials include expenditure of time and money on litigation expenses, diversion of energy from public work, and deterrence of entrance into public office. Considering these costs of litigation, the Court noted that the fear of being sued deters "all but the most resolute, or the most irresponsible" from efficiently and steadfastly pursuing their official duties.

La. Att'y Gen. Op. No. 08-0093 (7/24/08).

Additionally, the Attorney General explained the legislative history of the Act, noting (emphasis added):

> [t]he Act immunizes a broad array of actors and entities for a broad array of activities.
>
> . . .
>
> A flurry of recent decisions regarding emergency preparedness litigations reinforces the legislative intent to immunize anyone performing emergency activity who is acting in good faith.

6

Moreover, this interpretation is consistent with the prior jurisprudence of this court. Although in the context of addressing a different set of facts, in *Cates v. Beauregard Electric Cooperative, Inc.*, 316 So.2d 907, 916 (La.App. 3 Cir. 1975), *aff'd*, 328 So.2d 367 (La.1976) (emphasis added), this court explained:

> The terms 'willful', 'wanton', and 'reckless' have been applied to that degree of fault which lies between intent to do wrong, and the mere reasonable risk of harm involved in ordinary negligence. These terms apply to conduct which is still merely negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if harm was intended. The usual meaning assigned to do (sic) the terms is that the actor has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow.

Finally, this interpretation is consistent with the jurisprudence of our brethren in the fourth and fifth circuits. In *Sandrock v. St. Bernard Parish Gov't*, 14-1019, p. 3 (La.App. 4 Cir. 5/27/15), -- So.3d --, -- (emphasis added), in interpreting La.R.S. 9:2800.17, which provided complete immunity to the state and its political subdivisions in certain circumstances post-Hurricanes Katrina and Rita, the fourth circuit explained:

> Gross negligence has been defined by the Louisiana Supreme Court as "'want of even slight care and diligence' and the 'want of that diligence which even careless men are accustomed to exercise.'" *Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 93–3099, p. 4 (La.7/5/94), 639 So.2d 216, 219, quoting *State v. Vinzant*, 200 La. 301, 7 So.2d 917 (La.1942). "There is often no clear distinction between such [willful, wanton, or reckless] conduct and 'gross' negligence, and the two have tended to merge and take on the same meaning." *Id.*, quoting *Falkowski v. Maurus*, 637 So.2d 522 (La.App. 1st Cir.1993).

In *Haab*, 139 So.3d at 1182 (emphasis added), in interpreting La.R.S.29:735 and La.R.S.9:2798.1(C)(2), which provides for qualified immunity to public entities and their officials and employees except in the case of "criminal,

7

fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct," the fifth circuit cited, with approval, our explanation of the terms willful, wanton, and reckless as defined in *Cates*, 316 So.2d 907, and concluded:

> that only the most egregious conduct by parish agents, employees or representatives that exhibits <u>an active desire to cause harm</u>, or a callous indifference to the risk of potential harm from flagrantly bad conduct, will rise to the level of "willful misconduct" or "criminal, willful, outrageous, reckless, or flagrant misconduct" resulting in a forfeiture of all the immunity protections afforded by the [the Act] and the [discretionary immunity statute].

In light of our conclusion that "willful misconduct" pursuant to La.R.S. 29:735 is some voluntary, intentional breach of duty that is committed with bad intent or, at best, with wanton disregard for the consequences, we now turn to whether the activities of the personnel involved constitute such.

In 2005, when this accident occurred, Jeffrey Miller (hereafter "Miller") was Assistant Warden at the Sheriff's Prison. Miller was one of the individuals within the Calcasieu Parish Sheriff's Office tasked with overseeing the evacuation of all inmates from both the Sheriff's Prison and the Calcasieu Parish Correctional Center. Miller testified that there were over 1,200 inmates to evacuate between the two facilities and that it took fifty or sixty school buses to complete the evacuation, which began in the early morning hours and ended early in the evening.

Regarding the evacuation process, Miller testified:

Q    And you were shipping them out on school buses?

A    Correct. Correct.

Q    Y'all had an arrangement with the Calcasieu Parish School Board, I guess, to borrow the buses for that kind of use if you need it?

A    Correct, we were using the school buses. Basically, we asked for volunteers. We have some people that drive part-time for the school board.

Q    Some of the deputies?

8

A    Some of the deputies, so we asked for some of them to drive, and we got a few of them to drive, but we still needed more volunteers so -- and then that's when we kind of asked around, "Who thinks they could drive a bus?" Some people raised their hand and said they could do it, so we allowed them to drive.

Q    And you understand that -- I think there's a special endorsement or certain kind of license that is generally required to operate a school bus?

A    Correct, right.

Q    And y'all knew that when y'all were going through this process?

A    Right. Right. Some people didn't have the proper endorsement. I guess being in an emergency situation where we're trying to evacuate inmates, we had to go with what we had.

Q    And that was just the decision that was made at the time and that's what y'all did?

A    Correct.

Miller further testified that, since some of the deputies drove school buses for the Calcasieu Parish School Board on a part-time basis, those deputies were first asked to volunteer. Miller explained, however, that because "it was an emergency situation[,] we had to transport looking at possibly 1200 inmates," and that after they had run out of volunteers who drove a school bus for the parish, any deputy who said they were capable of driving a school bus was permitted to do so.

Lavergne testified that, at the time of the accident at issue, he was a transport officer, whose duties included driving inmates to various places. The vehicle that he routinely used was a fifteen-passenger van. Regarding the reasons he operated the bus, knowing that he did not possess the proper endorsement, he testified:

Q    Okay. Why did you drive the bus if you knew that under the law your license did not permit to drive you [sic] a bus?

A    One, we were in a state of emergency and we had to evacuate inmates. The sheriff's office, we don't have too much people that I know of that are licensed to drive it, and they were asking for volunteers. And I thought since I was a transport officer at that time, I would volunteer to help out.

9

Lavergne also explained that deputies who had the proper endorsements were first asked to volunteer in evacuation transport, but that "[a]ll the ones that done that were basically all gone already."

In brief, Appellant asserts the actions of the deputies constitute willful misconduct pursuant to La.R.S. 29:735 because their actions "were not only violations of multiple state laws, but also violations of the policies of the Calcasieu Parish Sheriff's Office." In support of this argument, he points out that that the Calcasieu Parish Sheriff's office has a policy that prisoner transport drivers obey state law, that Lavergne did not have a commercial driver's license or an endorsement for transporting passengers, that La.R.S. 32:81(A) requires that drivers following another vehicle "shall not follow another vehicle more closely than is reasonable and prudent," and that Miller "allowed people to drive who simply said they thought they could drive a bus," despite being aware of special licensing requirements and without inquiring into the deputies' driving records and bus-driving experience. In other words, Appellant asserts that technical violations of state law and the policies of the Calcasieu Parish Sheriff's Office in the face of an emergency constitute "willful misconduct," such that the immunity provided for in La.R.S. 29:735 is voided. We disagree. We conclude that such interpretation is not what the Legislature intended in enacting La.R.S. 29:735. To the contrary, we conclude that Miller and Lavergne's actions are the precise conduct intended to be immunized from liability.

We have reviewed the record and conclude that Appellant has presented no evidence that any official involved in the evacuation effort acted with willful misconduct. We find nothing about the conduct of Miller and Lavergne in the course of the evacuation to be even slightly suggestive of any bad intent or reckless disregard for the consequences of their actions. Instead, the evidence shows that

10

Miller and Lavergne had to make immediate decisions as to how to quickly and safely evacuate a large number of prisoners from a dangerous hurricane with minimal staff and even fewer who were properly licensed to drive a bus. The circumstances were less-than-ideal. The Legislature stated that it intended "to preserve the lives and property of the people of the state of Louisiana," and "[t]o prepare for prompt and efficient evacuation, rescue, care, and treatment of persons victimized or threatened by disasters or emergency" in promulgating the Act. La.R.S. 29:722. In those less-than-ideal circumstances, Miller and Lavergne made good faith, although perhaps imperfect, decisions about how to best evacuate numerous inmates from harm's way in order to preserve their lives. Thus, we find neither Miller nor Lavergne engaged in any willful misconduct. We, therefore, hold that there are no genuine issues of material fact and that the defendant is entitled to judgment as a matter of law; thus, we affirm the trial court's grant of summary judgment.

**ASSIGNMENT OF ERROR NUMBER TWO**

Appellant filed an amending petition on January 22, 2014, which was formally served on Appellees on February 10, 2014. On Appellant's motion, a pre-trial conference was held the following day on January 23, 2014. During the pre-trial conference, a jury trial was scheduled for June 23, 2014. The deadline for filing supplemental and amending pleadings was set for six weeks prior to trial. In February 2014, Appellant filed two separate motions for summary judgment. Hearing on Appellant's motions was scheduled for February 27, 2014. Because the judge pro tempore had an active conflict, Appellees filed a motion to recuse on February 21, 2014; a recusal order was signed by the judge on February 27, 2014. Thereafter, as a result of the judge's recusal, hearing on Appellant's motions and the trial date were continued.

11

On February 22, 2014, Appellees answered Appellant's supplemental and amending petition, asserting the defenses of immunity under La.R.S. 29:735 and La.R.S. 9:2800.17, which were in effect at the time of the incident made basis of this matter. On March 26, 2014, Appellant filed a motion to strike Appellees' supplemental and amending answer and affirmative defenses. On June 6, 2014, Appellees filed a motion for summary judgment, asserting Appellant was unable to establish an exception to the immunity statutes, La.R.S. 29:735 and La.R.S. 9:2800.17. Hearing on the motions of both parties was held on June 24, 2014. Appellant's motion to strike was denied, and Appellees' motion for summary judgment was granted.

In his second assignment of error, Appellant asserts that the trial court erred in failing to grant his motion to strike. In support of this assignment, he asserts immunity pursuant to La.R.S. 29:735 was not pled at an early stage of the proceedings such that he was deprived of fair notice of the defense. In further support of this assignment, he asserts that the answer was filed outside of the ten-day time period pursuant to La.Code Civ. P. art 1151. For the following reasons, we affirm the trial court's denial of Appellant's motion to strike.

The trial court has great discretion in determining whether to allow amendment to pleadings. Thus, a trial court's ruling on this issue will not be reversed absent an abuse of that discretion. *W.T.A. v. M.Y.*, 10-839 (La.App. 3 Cir. 3/9/11), 58 So.3d 612.

We noted in *Rogers v. State, ex rel. Dep't of Pub. Safety & Corr.*, 07-1060, p. 4 (La.App. 3 Cir. 1/30/08), 974 So.2d 919, 922, *writ denied*, 08-0504 (La. 4/25/08), 978 So.2d 367:

> "An affirmative defense raises new matter which, assuming the allegations in the petition to be true, constitutes a defense to the action and will have the effect of defeating plaintiff's demand on its merits."

*Webster v. Rushing*, 316 So.2d 111, 114 (La.1975). The defendant's answer shall set forth all affirmative defenses. La.Code Civ.P. arts. 1003 and 1005. "In the absence of inclusion of an affirmative defense in the answer, evidence can be adduced thereon only in the absence of an objection thereto." *Red Barn Chems., Inc. v. Lassalle*, 350 So.2d 1315, 1317 (La.App. 3 Cir.1977).

As this court previously noted in *Rider v. Fontenot*, 463 So.2d 951, 956 (La.App. 3 Cir.1985), cited with approval in *Patterson v. State*, 95–1668 (La.App. 3 Cir. 12/11/96), 685 So.2d 473, *writs denied*, 97–27, 97–108 (La.2/21/97), 688 So.2d 513:

> The policy behind the requirement that affirmative defenses be raised in answer is sensible and laudable. Because affirmative defenses raise matters for judicial resolution outside of issues raised by plaintiff's petition, plaintiff must be made aware of these matters at an early stage so that plaintiff can prepare an opposition to the defense and adjust his case, if necessary, in light of the new facts and issues raised by the affirmative defense. If the affirmative defense is allowed despite the defense not being raised in answer, the result is a surprise "trial by ambush" that unfairly aids the defendant, who knew about the defense even though plaintiff was kept in ignorance of the defense.

Additionally, in *Bayou Rapides Corp. v. Dole*, 14-906, p.18 (La.App. 3 Cir. 5/27/15), 165 So 3d 373, 384, we explained:

> The law takes a liberal approach toward allowing amended pleadings in order to promote the interests of justice. *Reeder v. North*, 97–0239 (La.10/21/97), 701 So.2d 1291. Amendment of pleadings should be liberally allowed, provided the movant is acting in good faith, the amendment is not sought as a delaying tactic, the opponent will not be unduly prejudiced and trial of the issues will not be unduly delayed. *Premier Bank, Nat'l. Ass'n v. Robinson*, 618 So.2d 1037 (La.App. 1st Cir.1993).

In the instant matter, there is no evidence that Appellees sought to amend their answer in bad faith or for the purpose of achieving a delay of the proceedings. In fact, it was the filing of Appellant's motions for summary judgment that resulted in a continuance of the trial date, as the judge serving at the time Appellant's motions were originally set to be heard had an active conflict in the matter. Moreover, Appellant neither alleges nor demonstrates how he was prejudiced by

the complained of answer. In fact, as a result of the continuances, Appellant had over six months to investigate the defenses. Further, almost no discovery had been completed at the time the amended answer was filed. Additionally, Appellant was the first to file an amended pleading. Appellees simply answered that pleading, long before the first scheduled trial date and well before the deadline for amending pleadings had passed.

In brief, Appellant focuses sharply on the fact that the immunity defenses were not asserted at the dawn of the litigation. His reliance on this is misplaced. Although it is accurate that this court has found that affirmative defenses must be asserted "at an early stage," this court further explained that this is so in order "that plaintiff can prepare an opposition to the defense and adjust his case, if necessary, in light of the new facts and issues raised by the affirmative defense." Although Appellees' affirmative defenses of immunity were not asserted at the outset of the litigation, we find that the affirmative defenses were asserted early enough that Appellant had more than ample opportunity to prepare a response to the defenses raised in the amended answer and to adjust his trial strategy accordingly.

Finally, Appellant asserts that, because Appellees' supplemental and amending answer was filed thirty-one days after they were served a copy by fax and twelve days after they received formal service, the entire supplemental and amending answer should be stricken from the record. We disagree. An answer may be filed at any time prior to confirmation of default. La.Code Civ. P. art. 1002. The proper remedy for failing to answer an amending petition is to move for default. *See Russell v. Illinois Cent. Gulf R.R.*, 96-2649 (La. 1/10/97), 686 So.2d 817 (defendant had filed answers to prior petitions but had inadvertently failed to answer plaintiff's second amended petition and plaintiff obtained a default judgment).

14

In light of the foregoing, we find no abuse of discretion in the trial court's denial of Appellant's motion to strike; thus, we affirm.

**REQUEST FOR REMAND**

Finally, Appellant requests that, upon reversal of the trial court's judgments granting Appellees' motion for summary judgment and denying Appellant's motion to strike, this case be remanded to Division E of the 14th Judicial District Court, on the grounds that Appellees lacked good faith in recusing the judge pro tempore. Because we affirm the judgment of the trial court in all respects, we need not address this request.

## CONCLUSION

For the foregoing reasons we affirm the trial court's judgment. All costs of this appeal are assessed to Appellant.

**AFFIRMED.**